IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2015 AUG 11 AM 8: 24

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
        DEPUTY

MONKEYMEDIA, INC.,
                        Plaintiff,

-vs-                                             Case No.  A-10-CA-319-SS

APPLE, INC.,
                        Defendant.
_____

MONKEYMEDIA, INC.,
                        Plaintiff,

-vs-                                             Case No.  A-10-CA-533-SS

BUENA  VISTA  HOME  ENTERTAINMENT,
INC.  d/b/a  WALT  DISNEY  STUDIOS  HOME
ENTERTAINMENT  et al.,
                        Defendants.
_____

## CONSOLIDATED *MARKMAN* ORDER

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled causes,

and specifically Plaintiff MONKEYmedia, Inc.'s Supplemental Claim Construction Brief [#276];[1]

Defendants Apple, Inc., Buena Vista Home Entertainment, Inc. d/b/a Walt Disney Studios Home

Entertainment, Inc., Twentieth Century Fox Home Entertainment, LLC, Lions Gate Entertainment

Inc., Paramount Pictures Corporation, Sony Pictures Home Entertainment, Sony Electronics Inc.,

Sony Computer Entertainment America, LLC, Warner Home Video, Inc., and Universal Studios Inc.

(collectively, Defendants)'s Opening Claim Construction Brief [#277]; Plaintiff's Response to

---

[1] Defendants have made joint filings with respect to the pre- and post-*Markman* briefing, and for ease of
reference, the Court uses the docket entry numbers reflected in case number A:10-CA-533-SS.



Defendants' [Opening] Claim Construction Brief [#286]; Defendants' Response Claim Construction Brief [#287]; the parties' Agreed Claim Construction Chart [#288]; the parties' Joint Claim Construction Chart [#301]; Plaintiff's Opening Post-*Markman* Brief [#297]; Defendants' Opening Post-*Markman* Brief [#298]; Plaintiff's Response to Defendants' Opening Post-*Markman* Brief [#299]; Defendants' Responsive Post-*Markman* Brief [#300]; the Report and Recommendation (R&R) of the Special Master [#302]; Plaintiff's Objections [#303]; and Defendants' Response to Plaintiff's Objections [#304]. Having reviewed the documents, the governing law, the arguments of the parties at the *Markman* hearing, and the file as a whole, the Court now enters the following opinion and orders.

### Background

This case involves two patent infringement suits brought by MONKEYmedia against Defendants. At issue in both suits is United States Patent No. 6,393,158 (the '158 Patent), titled "Method and Storage Device for Expanding and Contracting Continuous Play Media Seamlessly." The litigation began in 2010 when MONKEYmedia filed suit alleging infringements of patents from two families: (1) the "Deemphasis Patents" (U.S. Patents No. 6,177,938, No. 6,219,052, and No. 6,335,730) and (2) the "Seamless Expansion Patents," including the patent-in-suit and two other patents (U.S. Patents No. 7,467,218 and No. 7,890,648). Both suits are consolidated for purposes of this *Markman* order, but will be separately tried on the merits. *See* Order of Nov. 2, 2010 [#147].

The '158 Patent describes a method for the playback of digitally stored multimedia content in which the person playing the multimedia content can choose to temporarily halt playback of the main content, play optional "expansion" content, then, at the conclusion of the expansion content, begin playing the main content once again. For example, an advertiser might display a banner ad

on a mobile device while a person is watching a video, and if the viewer clicks on the banner ad, the ad goes full-screen and pauses the video; or, a cue for "bonus content" might pop up on a television screen during the playing of a DVD movie, and if the viewer clicks on the pop-up, the bonus content is played and the main content is paused.

The Court, through Special Master Karl Bayer, held its first of three *Markman* hearings in this case on March 1–2, 2011. The March 1–2, 2011 *Markman* hearing concerned the Deemphasis Patents. The Special Master issued his Report and Recommendation on claim construction on September 5, 2012, which the Court adopted on February 22, 2013.

On June 28–29, 2011, the Court, through the Special Master, held the second *Markman* hearing, which concerned the Seamless Expansion Patents. No Report and Recommendation issued following the hearing, however, as shortly thereafter, the Court stayed both cases pending the outcome of the U.S. Patent and Trademark Office (PTO)'s reexamination of the Seamless Expansion Patents. *See* Order of July 27, 2011 [#228]. During reexamination, the PTO rejected Claims 1–34 of the '158 Patent as unpatentable; MONKEYmedia did not appeal the PTO's finding to the Federal Circuit, and the PTO subsequently cancelled those claims. MONKEYmedia formally disclaimed all claims in the other two Seamless Expansion Patents, ending the reexamination proceedings.

Claims 35–41 of the '158 Patent, seven new claims based on the same specification and figures as the previously cancelled claims, were permitted by the PTO after reexamination. On MONKEYmedia's motion, the Court lifted the stay and permitted MONKEYmedia to file a supplemental complaint. *See* Order of June 13, 2014 [#260]. Claims 35–41 are now at issue in both cause numbers. The Court, through the Special Master, held the most recent *Markman* hearing on October 30–31, 2014, and the Special Master issued his Report and Recommendation on claim

construction on February 5, 2015.  To the extent the parties have made specific objections to the

Special Master's factual findings or legal conclusions, they are entitled to de novo review of those

findings and conclusions.  FED. R. CIV. P. 53(f).

## Analysis

### I.   Claim Construction—Legal Standard

When construing claims, courts begin with "an examination of the intrinsic evidence, i.e.,

the claims, the rest of the specification and, if in evidence, the prosecution history." *CCS Fitness,*

*Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002); *see also Interactive Gift Express, Inc.*

*v. Compuserve Inc.*, 256 F.3d 1323, 1327 (Fed. Cir. 2001).

The words in the claims themselves are of primary importance in the analysis, as the claim

language in a patent defines the scope of the invention. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d

1107, 1121 (Fed. Cir. 1985) (en banc).  The words of a claim "are generally given their ordinary and

customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). "[T]he ordinary

and customary meaning of a claim term is the meaning that the term would have to a person of

ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of

the patent application."[2]  *Id.* at 1313.  The inquiry into how a person of ordinary skill in the art

understands a claim term provides an "objective baseline" from which to begin claim interpretation.

*Id.*  The person of ordinary skill in the art is understood to read a claim term not only in the context

of the particular claim in which the term appears, but in the context of the entire patent, including

---

[2] This hypothetical person is now commonly referred to simply as an "ordinarily skilled artisan." *E.g.*, *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1365–66 (Fed. Cir. 2013).

the specification; thus, both the plain language of the claims and the context in which the various terms appear "provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314.

The specification also plays a significant role in the analysis. *Id.* at 1315. The Federal Circuit has repeatedly reaffirmed the principle that the specification "is always highly relevant . . . . Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). In interpreting the effect the specification has on the claim limitations, however, courts must pay special attention to the admonition that one looks "to the specification to ascertain the meaning of the claim term as it is used by the inventor in the context of the entirety of his invention, and not merely to limit a claim term." *Interactive Gift*, 256 F.3d at 1332 (internal quotation marks and citations omitted).

The final form of intrinsic evidence the Court may consider is the prosecution history. Although the prosecution history "represents an ongoing negotiation between the PTO and the applicant" and therefore "often lacks the clarity of the specification and thus is less useful for claim construction purposes," it can nonetheless "often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317.

Aside from the intrinsic evidence, the Court may also consult "extrinsic evidence," which is "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* While extrinsic evidence "can shed useful light on the relevant art," the Federal Circuit has explained it is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.'" *Id.* at 1317 (quoting *C.R. Bard,*

*Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)). Extrinsic evidence in the form of expert testimony may be useful to a court for "a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* at 1318. However, conclusory, unsupported assertions by an expert as to the definition of a claim term are not useful, and should be discounted. *Id.* In general, extrinsic evidence is considered "less reliable than the patent and its prosecution history in determining how to read claim terms," although it may be helpful. *Id.*

The purpose of claim construction is to "'determin[e] the meaning and scope of the patent claims asserted to be infringed.'" *02 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996)). Thus, "[w]hen the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute." *Id.* However, "district courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims." *Id.* at 1362. For example, no construction is required if the requested construction would be "'an obligatory exercise in redundancy,'" or if the "disputed issue [is] the proper application of a claim term to an accused process rather the scope of the term." *Id.* (quoting *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)).

**II.     Application**

**A.     Special Master's Recommendations**

The Special Master's recommendations are as follows:

| Term | Recommendation |
|---|---|
| **Person of Ordinary Skill in the Art** | A bachelor's degree in computer science, cognitive science, computer engineering, computer user interface design, multimedia or an equivalent degree, and at least 2 years of experience in the field of computer user interface design or software design & implementation<br><br>-or-<br><br>A post graduate degree in computer science, cognitive science, computer engineering, computer user interface design, multimedia or an equivalent degree, and at least one year of experience in the field of computer user interface design or software design and implementation |
| **Claim Term** | **Recommended Construction** |
| **stored content**<br><br>Claims 35, 36, 37, 38, 39, 40, 41 | Content that minimally contains images or text that can be displayed, and is stored |
| **segment**<br><br>Claims 35, 36, 37, 38, 39, 40, 41 | A sequence of stored content that is fixed and predetermined prior to playing |
| **link**<br><br>Claims 35, 36, 37, 38, 39, 40, 41 | A connection from one specified segment to another specified segment |
| **linking**<br><br>Claims 35, 36, 37, 38, 39, 40, 41 | Following the connection from one specified segment to another specified segment |

| | |
|---|---|
| **expansion link**<br><br>Claims 35, 36, 37, 38, 39, 40, 41 | A link from a specified segment to a specified expansion segment |
| **continuing segment**<br><br>Claims 35, 36, 37, 38, 39, 40, 41 | The segment of main content that plays after the "at least one segment" |
| **cue**<br><br>Claims 35, 36, 37, 38, 39, 40, 41 | A prompt or guiding suggestion |
| **highlighting**<br><br>Claims 35, 36, 37, 38, 39, 40, 41 | Calling attention to a cue or to other information |
| **"playing said segments further comprises highlighting an expansion segment cue"**<br><br>Claims 35, 36, 37, 38, 39, 40, 41 | No construction necessary |
| **discernible entity**<br><br>Claims 35, 36 | A graphical or auditory element that is distinguishable from the surrounding context |
| **"playing said segments further comprises playing at least one discernible entity"**<br><br>Claims 35, 36 | No construction necessary |
| **transition**<br><br>Claims 35, 36 | Audio or visual content or effect that is presented while passing from one portion of a presentation to another portion of the presentation |
| **continuity link offset**<br><br>Claims 35, 36 | A point temporally located after the first terminus of the continuing segment |

| | |
|---|---|
| **"calculating the first terminus of the continuing segment by reference to a continuity link offset"**<br><br>Claims 35, 36 | Indefinite |
| **expansion cue container**<br><br>Claims 37, 38, 39 | A receptacle for holding expansion cues into and from which cues can be inserted and removed |
| **"wherein determining whether said expansion segment cue has been selected further comprises determining if the expansion cue container has been selected for visual display"**<br><br>Claims 38, 39 | Indefinite |
| **"determining whether said expansion segment cue has been selected further comprises causing selection of at least one other expansion cue from the plurality of expansion cues if said expansion segment cue has been selected"**<br><br>Claim 39 | Indefinite |
| **"a motion to select said expansion cue without pushing a button on a selector device"**<br><br>Claim 41 | No construction necessary |

To the extent the parties have not objected to the Special Master's constructions of certain claim terms, the Court accepts the Special Master's recommendations as to those claim terms without further comment. Those claim terms are: "continuing segment"; "cue"; "highlighting";

"playing said segments further comprises highlighting an expansion segment cue"; "discernible entity"; "playing said segments further comprises playing at least one discernible entity"; "transition"; and "a motion to select said expansion cue without pushing a button on a selector device." Further, as the parties have not objected to the Special Master's definition of a person of ordinary skill in the art, the Court accepts that definition without further comment.

**B.     Objections**

The Court now turns to the parties' specific objections.

**1.     "stored content"**

The Special Master recommended this term be construed as: "Content that minimally contains images or text that can be displayed, and is stored." The parties agree stored content is multimedia content which is stored so it can later be accessed and played, but disagree concerning whether stored content can encompass audio content absent images or text. MONKEYmedia argues the term must be construed to encompass an audio stream playing without any accompanying video or text, while Defendants take the position all stored content must contain video or text (but can contain, in addition to the video or text, audio). In their pre-hearing briefing, Defendants argued the term either required no construction or should be construed as "audio/visual content that is stored"; in their post-hearing briefing, however, Defendants proposed the alternative construction ultimately recommended by the Special Master.

The Special Master's construction is directly supported by the language of the specification. Specifically, the specification states that the invention pertains to "digitally stored interactive multimedia content" and explains that "multimedia" "can be defined as *minimally containing a stream of image or text content* forming a perceived continuity when presented to an observer/user."

-10-

Pl.'s Hr'g Ex. 57 ('158 Patent) at col. 1 ll. 10–11 (emphasis added).   The Special Master's construction thus tracks the specification in delineating the scope of stored content: it must, at minimum, contain image or text content.

MONKEYmedia's objection is twofold: first, MONKEYmedia complains the construction is unhelpful because it repeats the terms "stored" and "content"; second, MONKEYmedia reiterates the construction "excludes the possibility of an audio stream playing at one point and a video stream playing at another point" and claims by excluding that possibility, the Special Master "strays from the teachings of the patent about multimedia content." Objections [#303] at 2, 3.  Neither objection is persuasive.  As for the repetition of the words "stored" and "content" in the Special Master's construction, the Court notes MONKEYmedia's proposed construction of "stored content" (were the Court to find it necessary to construe the term) also included the words "stored" and "content." *See* Pl.'s Supp. Brief [#276] at 10 (suggesting the construction "audio/visual content that is stored"). The parties disagree as to the breadth of the term "stored content" as used in the '158 Patent, not as to the generic definitions of the words "stored" and "content."  As for exclusion of the possibility an audio stream unaccompanied by video or text could be stored content, that exclusion is precisely what the specification teaches in defining multimedia as *minimally*, or, at minimum, containing images or text.  In addition to "minimally containing a stream of image or text content," the specification explains multimedia "may *further* contain content streams forming perceived audio continuities" and "may *further* contain other content streams including but not limited to closed captioned support . . . ." '158 Patent col. 1 ll. 10–19 (emphasis added). By stating multimedia "may further contain" other types of content—i.e., may contain other types of content in addition to the

types that already exist—the specification reinforces its teaching concerning what multimedia must contain at minimum.

The Court agrees with the Special Master's recommendation, and MONKEYmedia's objections are OVERRULED.

### 2.   "segment"

The Special Master recommended this term be construed as: "A sequence of stored content that is fixed and predetermined prior to playing." MONKEYmedia strongly objects, urging its contrary definition, "a stream or portion of a stream of audio/visual content," appropriately captures the meaning of the term, at the time of the invention, to a person of ordinary skill in the art.

The parties' differing constructions of this term reveal their fundamental disagreement regarding what invention, precisely, is disclosed by the '158 Patent. Both parties agree that as of the date of the invention, "segment" loosely connoted something with a beginning and an end, and both parties agree that within the context of the '158 Patent, "stored content" is comprised of segments. At that point, the parties diverge. MONKEYmedia contends segments are dynamically defined by the end user, meaning by choosing to perform a content expansion, the end user, at the moment of decision, determines the end of a segment of main content and the beginning of a segment of expansion content—or, in the language of the patent, determines the second terminus of the "at least one segment" and the first terminus of the "continuing segment." In contrast, Defendants argue segments, and therefore their beginning and ending termini, are predetermined and fixed during the content authoring process; in other words, in Defendants' view, each segment is a piece of stored content that exists and has a known beginning and ending before it is played.

-12-

The Court finds the claim language, specification, and prosecution history all support Defendants' position and the Special Master's recommendation. First, the first limitation of each of the four independent claims—Claims 35, 37, 40, and 41—contemplates segments with first and second termini that are known before any content is played. Each of the claims begins by reciting: "A method for playing a stored content comprising: providing a plurality of segments which collectively comprise said stored content, *wherein each of said segments has a first terminus and a second terminus . . . .*" '158 Patent, Ex Parte Reexamination Certificate (Reexam. Cert.) col. 1 ll. 20–23, 63–66, col. 2 ll. 36–39, col. 3 ll. 1–4 (emphasis added). In a subsequent step of each of the claims, "at least one segment" of the stored content is "play[ed]," i.e., presented to the end user. *Id.* col. 1 l. 29, col. 2 ll. 5, 45, col. 3 l. 10. Consequently, when the steps of each claim are performed in order, the first and second termini of the segments are known *before* they are played, not defined on the fly by the end user.

The specification supports this understanding of the claim language. The summary of the invention explains, for example, that one method of the invention "includes playing at least one segment with the temporal flow [and] determining whether a content expansion is desired *prior to reaching the second terminus.*" '158 Patent col. 7 ll. 30–31 (emphasis added). Were the second terminus of the "at least one segment" unknown while that segment played, this language would not make sense, as it contemplates a decision made prior to arrival at a known point (the second terminus). Throughout the specification, the patent similarly describes termini as defined rather than unknown points within segments. *See, e.g., id.* col. 9 ll. 34–36 ("The method further includes . . . determining whether a content expansion is desired prior to reaching the second terminus."); col. 10 ll. 1–8 ("Each of the segment descriptors of the method includes a first terminus, a second terminus

and a continuity link.  The first terminus references a first time point of a continuous play media stream segment . . . .  The second terminus references a second time point of the continuous play media stream segment."); col. 16 ll. 3–6 ("In certain preferred embodiments of the invention, each of these [expansion] decision points is at the ending terminus of the segment it is in and the beginning terminus of the continuing segment.").

MONKEYmedia argues the Special Master's recommended construction is inconsistent with the specification's teaching that "[i]n certain preferred embodiments, one or both of the termini may grow earlier or later temporally with regards to the continuous play content." '158 Patent col. 16 ll. 38–40.  The Court disagrees.  As Defendants point out, nothing in this language supports establishing the beginning and ending termini of a segment on the fly according to end-user input; rather, the language refers to a choice that can be made in certain embodiments of the invention during the authoring process—specifically, whether the author chooses to begin the expansion segment temporally earlier or later vis-à-vis the continuous play content.  *See Markman* Hr'g Tr. [A:10-CA-319, #161] at 64:17–65:2.  That understanding of the language comports with the remainder of the specification and the claim language indicating termini are known prior to user interaction with the multimedia content.

The Special Master's recommended construction is also supported by the prosecution history. During reexamination, MONKEYmedia attempted to distinguish a prior art reference from the invention disclosed by the '158 Patent by arguing that unlike the prior art reference, which taught predetermined, fixed segments encoded during the authoring process, the specification of the '158 Patent teaches dynamically defined segments. *See* Defs.' Hr'g Ex. 69 at 42 ("In this dynamic system, the 'second terminus' of the 'at least one segment' cannot be known until the decision point to

expand is known. Similarly, the first terminus of the 'continuing segment' is not known until the decision point to expand is determined."). The Examiner disagreed, explaining the '158 Patent also taught fixed and predetermined segments ("scenes"): "With respect to [MONKEYmedia]'s arguments that [the prior art reference] is comprised of fixed and predetermined scenes encoded during an authoring process, Examiner notes that the '158 patent also has pre-determined scenes as depicted in figure 3B, 7A, 7B and 8A–8B." Defs.' Hr'g Ex. 73 at 67. On appeal to the PTO Board, MONKEYmedia re-urged its argument and the Examiner once again disagreed:

> With respect to [MONKEYmedia]'s argument . . . that the instant invention discloses dynamically defined segments and links which are different than predetermined and fixed scenes encoded during an authoring process as discussed in [the prior art reference], Examiner disagrees. . . . Examiner finds [MONKEYmedia]'s argument that the defining of segments is "dynamic" to be inaccurate and not what is claimed in claims 15–16 and 23 or supported by the Specification.

Defs.' Hr'g Ex. 77 at 59–60. The Examiner went on to explain the claim language describing individual segments actually contradicted MONKEYmedia's position:

> In fact, the first limitation of claims 15 and 23 state[s] "wherein each of said segments has a first terminus and a second terminus". Thus, it would seem that the claim actually contradicts [MONKEYmedia]'s argument that the second terminus is "not known" since the claim requires that the second terminus of the first segment initially be known.

*Id.* at 66. The Board affirmed the Examiner's findings. *See* Defs.' Hr'g Ex. 78 at 2. While the claims then under reexamination were cancelled, those presently at issue create the same contradiction: as previously noted, the same phrase—"wherein each of said segments has a first terminus and a second terminus"—appears verbatim in the first limitation of independent Claims 35, 37, 40, and 41. '158 Patent, Reexam. Cert. col. 1 ll. 22–23, 65–66, col. 2 ll. 38–39, col. 3 ll. 3–4.

The Court agrees with both the Special Master and the Examiner that MONKEYmedia's contention segments are dynamically defined is unsupported by the specification and figures of the '158 Patent.   Consequently, the Court adopts the Special Master's recommendation, and MONKEYmedia's objections are OVERRULED.

### 3.   "link," "linking," and "expansion link"

The Special Master recommended the term "link" be construed as: "A connection from one specified segment to another specified segment"; the term "linking" be construed as: "Following the connection from one specified segment to another specified segment"; and the term "expansion link" be construed as: "A link from a specified segment to a specified expansion segment."  Similar to the parties' dispute over the proper construction of the term "segment," their main disagreement concerning the "link" terms is whether the connections between segments are created during the authoring process or dynamically defined by the end user while the content is being presented.

The Special Master's recommendations track Defendants' proposed constructions of these terms, with the exception that the Special Master omitted the word "predetermined" from his recommendations as to "link" and "linking."  *See* Defs.' Opening Post-Hr'g Brief [#298] at 13 (construing "link" as "a predetermined connection from one specified segment to another specified segment" and "linking" as "following the predetermined connection from one specified segment to another specified segment").  MONKEYmedia's primary objection is to the Special Master's use of the word "specified," which MONKEYmedia argues "leaves room for Defendants to argue that 'specified' implies 'predetermined'" although the Special Master omitted that word from his recommendation.  Objections [#303] at 6.  In MONKEYmedia's view, links need not be related to specified segments; rather, because the connections between segments are allegedly dynamically

-16-

defined, links are merely "rule[s] or collection[s] of rules that determine[] the selection of content to play next." *Id.* at 7.

As with the term "segment," the Court finds the '158 Patent does not teach dynamic linking. The independent claims describe "links" either as "associated with" segments, '158 Patent, Reexam. Cert., col. 1 ll. 26–38, or as connections "from" one segment "to" another segment, *id.* col. 1 ll. 36–37. Figure 3B, which "depicts the segment links between continuous play media segments," shows a segment which "has two links **114** and **116**," one of which leads to an expansion segment and one of which leads to another segment of main content. *See* '158 Patent fig. 3B, col. 12 ll. 34–44. The specification explains in certain embodiments of the invention, the segment descriptor, which identifies the segment and its termini, also contains a "continuity link" connecting the segment to a "successor segment" and an "expansion link pointer" connecting the segment to an expansion segment descriptor. *Id.* figs. 9A, 9B, col. 20 ll. 29–46. Nowhere does the specification indicate that user interaction with the media being displayed alters or determines the nature of those links.

Urging the Court to adopt its more expansive construction of the claim terms, MONKEYmedia points to the following language:

> Continuous play media segment **102** contains a link **118** to continuous play media segment **104**. In certain preferred embodiments, the link **118** may be implicitly derived from the remembered state of the content player during the playing of segment **100**. In certain further preferred embodiments of the invention, this implicit derivation may be determined by a stack included in the content player and the indication to do this in certain preferred embodiments is a continuity link not indicating a segment.

'158 Patent, col. 12 ll. 44–55. MONKEYmedia argues this teaches "rule-based links based on user interaction." Objections [#303] at 7. The Court cannot agree. Rather, as to the link "implicitly derived from the remembered state of the content player," the Court agrees with Defendants'

explanation: this language encapsulates how, in order to return to and play the next continuous play media segment following an expansion, the content player follows the author-defined connections between individual data structures (i.e., segment descriptors and expansion link descriptors) back up through the data structure tree to the original continuous play media segment, "implicitly deriving" the link between the original segment and next segment of content. *See Markman* Hr'g Tr. [A:10-CA-319, #161] at 195:18–198:21 (explaining the concept in detail). The remainder of the excerpt explains an alternative embodiment of the invention in which the author can program the content player to store a link between a segment of main content and a continuing segment on a stack, and after the presentation of expansion material is complete, direct the player to retrieve that link and follow it to the continuing segment. *See id.* at 199:19–200:8. The links involved in these processes are necessarily fixed and predictable, not defined by the end user.

This understanding of links and linking as taught by the '158 Patent is also supported by its prosecution history:

> Regarding [MONKEYmedia]'s argument that the dynamic user experience **designed into the claimed invention** is the result of giving control to the user, which drives . . . the linking between these segments, Examiner disagrees. Claims 1, 7, 14, 15, and 23 do not recite . . . that the links are variably adaptive and computationally responsive to viewers. The claims further do not recite . . . calculating links on the fly.

Defs.' Hr'g Ex. 73 at 66. As with the previously cancelled claims described, the Court finds the claims presently at issue do not teach calculating links on the fly or rule-based, adaptive connections between segments. The Court is untroubled by MONKEYmedia's assertion the Special Master's inclusion of the word "specified" in his recommended construction will permit Defendants to argue the connections between segments are fixed; the specification teaches that the connections between

-18-

segments *are* fixed, and the Special Master's construction of the link-related terms captures that teaching.   To avoid any potential for ambiguity, the Court finds insertion of the word "predetermined" into the constructions of "link" and "linking" is appropriate.   Accordingly, the Court construes "link" as: "A predetermined connection from one specified segment to another specified segment"; "linking" as: "Following the predetermined connection from one specified segment to another specified segment"; and "expansion link" identically to the Special Master's recommendation.

The Court adopts the Special Master's constructions of all three link-related terms AS MODIFIED, and MONKEYmedia's objections are OVERRULED.

4.   **"expansion cue container"**

The Special Master recommended this term be construed as: "A receptacle for holding expansion cues into and from which cues can be inserted and removed."   MONKEYmedia argues this construction improperly restricts the term to a single embodiment described in the patent: specifically, a graphic depiction in the shape of a cup that is itself interactively accessible by the end user. The Court disagrees that the Special Master's construction improperly restricts the claim term, and finds his recommendation is supported by the specification and the prosecution history.

First, the Special Master accurately construed "expansion cue container" to refer to a "receptacle."   The specification describes the expansion cue container as something from which expansion cues can "be[] removed," within which expansion cues can be "contained," and into which expansion cues may be "inserted." '158 Patent col. 13 ll. 46–47, col. 14 ll. 16–17, 53–54. During reexamination of the '158 Patent, in determining MONKEYmedia's new claim "wherein said expansion segment cue is one of a plurality of expansion cues in an expansion cue container" was

-19-

patentable, the Examiner explained: "The expansion cue container must be a visual expansion cue container as specified in figures 5A–5E and the corresponding disclosure[.]" Defs.' Hr'g Ex. 73 at 94. Figures 5A–5E all depict the expansion cue container as a receptacle, rather than more generically as a shape or grouping of shapes. *See* '158 Patent figs. 5A, 5B, 5C, 5E.

Further, the Court does not agree with MONKEYmedia that the Special Master's construction requires the expansion cue container to be interactively accessible by the end user. The recommended construction requires only that cues can be inserted into and removed from the container, not that the end user must perform the insertion and removal. This understanding is perfectly consistent with the specification, which teaches that in embodiments where the container is not interactively accessible, the container "may move or be manipulated only as shown in the continuous play media stream." *Id.* col. 14 ll. 51–53. In other words, the user may have nothing to do with the cues appearing and disappearing from the screen: "[b]y way of example, a person interviewed may pull something [a cue] from their handbag [an expansion cue container] and it [the cue] may be highlighted for possible expansion." *Id.* col. 14 ll. 55–57.

The Court agrees with the Special Master's construction, and MONKEYmedia's objections are OVERRULED.

### 5.    The indefinite claim terms

The Special Master recommended the following claim terms be construed as indefinite: (1)"calculating the first terminus of the continuing segment by reference to a continuity link offset"; (2) "wherein determining whether said expansion segment cue has been selected further comprises determining if the expansion cue container has been selected for visual display"; and (3) "determining whether said expansion segment cue has been selected further comprises causing

-20-

selection of at least one other expansion cue from the plurality of expansion cues if said expansion segment cue has been selected." A discussion of each, and of the related term "continuity link offset," follows.

Definiteness is to be evaluated from the perspective of someone skilled in the relevant art. *Nautilus v. Biosig Instruments Inc.*, 134 S. Ct. 2120, 2128 (2014). In assessing definiteness, claims are to be read in light of the patent's specification and prosecution history. *Id.* Definiteness is measured from the viewpoint of a person skilled in the art at the time the patent was filed. *Id.* Recently, in *Nautilus*, the Supreme Court changed the standard for indefiniteness. The previous standard assessed definiteness based on whether the claims were "amenable to construction" or "insolubly ambiguous." *Id.* at 2130. The Court rejected these approaches because "it cannot be sufficient that a court can ascribe *some* meaning to a patent's claims; the definiteness inquiry trains on the understanding of a skilled artisan at the time of the patent application, not that of a court viewing matters *post hoc*." *Id.* (emphasis in original). Application of these standards "diminish[ed] the definiteness requirement's public-notice function and foster[ed] the innovation-discouraging 'zone of uncertainty,' against which this Court has warned." *Id.* (internal citation omitted). In place of the old standard, the Court adopted a new one: whether "[the] claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Id.* at 2124.

### i. "calculating the first terminus of the continuing segment by reference to a continuity link offset"/"continuity link offset"

The Special Master was correct in finding the phrase "calculating the first terminus of the continuing segment by reference to a continuity link offset" renders Claim 35 indefinite. As

previously explained, the '158 Patent teaches segments with fixed, predetermined beginning and ending termini that are defined by the content author, rather than determined during playback of content in response to user interaction. The phrase is part of the following dependent limitation that MONKEYmedia added to its claimed method during reexamination:

> wherein the additional link from said expansion segment to said continuing segment comprises calculating the first terminus of the continuing segment by reference to a continuity link offset after determining whether a content expansion is desired and wherein playing said continuing segment begins at said first terminus of said continuing segment.

'158 Patent, Reexam. Cert. col. 1 ll. 54–60. The notion of "calculating" a segment during playback and the idea a link between two segments is "comprise[d of]" a calculation are fundamentally inconsistent with the claim language teaching that every segment of stored content has two known, author-defined termini ("wherein each of said segments has a first terminus and a second terminus") and that links are known, author-defined connections between specified segments of content (links are "associated with" segments or are connections "from" one segment "to" another segment). *See id.* col. 1. ll. 22–23, 26–28, 36–37.

　　While the Court is mindful that claims should not be confined to the embodiments set forth in the specification, *see Phillips*, 415 F.3d at 1323, it is also true that the claims "must conform to the invention as set forth in the remainder of the specification and the terms and phrases used in the claims must find clear support or antecedent basis in the description so that the meaning of the terms in the claims may be ascertainable by reference to the description." 37 C.F.R. § 1.75(d)(1). Tellingly, nowhere in its briefing does MONKEYmedia point to any language in the patent, save the limitation (and its dependent claim) at issue, that explicates this phrase, only reiterating that the Examiner found the new claims to be patentable. *See* Pl.'s Supp. Brief [#276] at 14–16, 19; Pl.'s

Resp. Defs.' Opening Brief [#286] at 7, 9; Pl.'s Post-Hr'g Brief [#297] at 13–14, 18; Pl.'s Resp.

Defs.' Post-Hr'g Brief [#299] at 2, 6–7; Objections [#303] at 7–9, 11. As Defendants note, however,

the Examiner explained its rationale for its finding with reference to the prior art: "A calculation of

a first terminus of the continuing segment by reference to a continuity link offset is not taught or

suggested by the prior art currently of record in this proceeding.  Claim 36 [issued Claim 35] is

accordingly held to be patentable." Defs.' Hr'g Ex. 73 at 93–94. Defendants have demonstrated the

concept of "calculating" a segment's terminus is inconsistent with the claimed invention as taught

in the remainder of the patent; given that inconsistency, Claim 35 is indefinite, as it "fail[s] to

inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus*,

134 S. Ct. at 2124.

The Special Master was correct to find the above-quoted phrase renders Claim 35 (and

dependent Claim 36) indefinite. The term "continuity link offset," which appears only in Claim 35

(and by extension in dependent Claim 36) therefore need not be construed.  Alternatively, the Court

adopts the Special Master's construction of the term.  MONKEYmedia defines a "continuity link

offset" not as a point, but rather, as a numeric value; however, the only portion of the specification

that teaches the concept states that a link from one segment can go not to the first terminus of a

continuing segment, "but to landing offset **272** temporally located after first terminus **264**." '158

Patent col. 17 ll. 15–17.  A link—a predetermined connection between specified segments—cannot

connect a segment to a numeric value.

The Court agrees with the Special Master, and MONKEYmedia's objections are

OVERRULED.

    ii.    **"wherein determining whether said expansion segment cue has been selected further comprises determining if the expansion cue container has been selected for visual display"**

Defendants argue the Special Master was correct in finding this phrase indefinite because this limitation, found in dependent Claim 38, recites an action necessary to practice Claim 37. Specifically, Claim 37 recites "wherein playing said segments further comprises highlighting an expansion segment cue" and "wherein said expansion segment cue is one of a plurality of expansion cues in an expansion cue container." '158 Patent, Reexam. Cert., col. 2 ll. 17–18, 23–24. Because "highlighting" a cue requires that cue, in Defendants' view, to be visually displayed, and because the highlighted expansion segment cue is one of several within an expansion cue container, Defendants reason Claim 37 already requires the expansion cue container to be visually displayed, rendering Claim 38 indefinite. MONKEYmedia counters Claim 38 "is simply a further action that must be performed when determining in Claim 37 whether the cue has been selected." Objections [#303] at 11.

The Special Master was correct in finding this phrase renders the claim indefinite. Yet the Court cannot agree with all of Defendants' reasoning, as "highlighting" is not limited to "visually emphasizing"—a cue could be highlighted using audio, for example. The problem arises with Claim 38's direction to "determin[e] if the expansion cue container has been selected for visual display." Expansion cue containers are necessarily visual, as they contemplate the insertion and removal of cues. *See supra* section II.B.5. The cues contained within expansion cue containers must therefore also be visually displayed. Thus, Claim 37's teaching "wherein said expansion segment cue is one of a plurality of expansion cues in an expansion cue container" indicates the expansion segment cue

is visually displayed within a visible expansion cue container. As such, Claim 38 is nonsensical: the '158 Patent does not teach non-visually-displayed expansion cue containers.

The Court agrees with the Special Master's recommendation, and MONKEYmedia's objections are OVERRULED.

> **iii.** **"determining whether said expansion segment cue has been selected further comprises causing selection of at least one other expansion cue from the plurality of expansion cues if said expansion segment cue has been selected"**

Finally, the Court agrees with the Special Master's finding this phrase independently renders Claim 39 indefinite. As Defendants correctly point out, this limitation is incoherent, as it makes "determining whether an expansion segment cue has been selected" dependent upon whether ("if") "said expansion segment cue has been selected." '158 Patent, Reexam. Cert. col. 2 ll. 30–35. Even if, as MONKEYmedia offers, this language could refer to selecting a second cue if the first cue has been selected, MONKEYmedia points to nothing in the claim language or the specification which might indicate as such to an ordinarily skilled artisan. While the definiteness requirement "recogniz[es] that absolute precision is unattainable," it also "mandates clarity" in communicating the scope of the claimed invention. *Nautilus*, 134 S. Ct. at 2130. Given its apparent circularity, this limitation is not successful in communicating with clarity the scope of the invention claimed by the '158 Patent.

The Special Master was correct to find this phrase renders Claim 39 indefinite, and MONKEYmedia's objections are OVERRULED.

**Conclusion**

MONKEYmedia's objections to the Special Master's recommended constructions are OVERRULED, and the Special Master's recommended constructions are ACCEPTED AS MODIFIED.

Accordingly:

IT IS ORDERED that Plaintiff MONKEYmedia's Objections [#303] are OVERRULED; and

IT IS FINALLY ORDERED that the Report and Recommendation of the Special Master [#302] is ACCEPTED AS MODIFIED as set forth in this opinion.

SIGNED this the _10th_ day of August 2015.


_Samsparks_
SAM SPARKS
UNITED STATES DISTRICT JUDGE